IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LAWRENCE MCKISSIC, ) | CASE NO. 1:12 CV 1057 |
| Plaintiff, ) | |
| v. ) | JUDGE DONALD C. NUGENT |
| JASON MILLER, *et al.*, ) | |
| Defendants. ) | MEMORANDUM OPINION AND ORDER |

This action is before the Court on Defendant Jason Miller's Motion to Dismiss or Alternatively, Motion for Summary Judgment. (ECF # 64). Plaintiff filed a Memorandum in Opposition to the motion, (ECF # 67), and Officer Miller filed a Reply to the response. (ECF # 75). Following briefing, Officer Miller filed a Notice of Supplemental Authority In Support of Defendant's Motion to Dismiss, (ECF #76); Plaintiff filed a response to the Defendant's Notice, (ECF #77); and, Plaintiff filed a Notice of Supplemental Authority in Support of his Opposition to the Motion to Dismiss or Alternatively Motion for Summary Judgment. (ECF #78).

Plaintiff, Lawrence McKissic, was shot multiple times by Officer Miller following an undercover drug bust. Mr. McKissic was driving the car in which the undercover drug buy was conducted. He was not the original target of the investigation. The target was removed from the car and arrested without incident. At the time of the shooting, Officer Miller was employed by the Strongsville Police Department and was acting through the Northern Ohio Law Enforcement Task Force ("NOLE Task Force"), a task force made up of law enforcement officers from

several local departments and overseen by the Federal Bureau of Investigation ("FBI").

Mr. McKissic brought suit against Officer Miller and the City of Strongsville in this action, alleging violations of United States Constitution. He claims that Officer Miller violated his Fourth and Fifth Amendment rights, by exercising excessive force against him during the course of his arrest. In addition, Mr. McKissic alleges that the City of Strongsville is liable under the Fourteenth Amendment for the violation of his Fourth Amendment rights, because: (1) it failed to properly supervise its officers with respect to the use of force; (2) it engaged in a custom, policy or practice of using excessive force on citizens; (3) it ratified the use of excessive force by its officers; and/or (4) it failed to supervise of discipline those who used excessive force on citizens. Mr. McKissic also filed a separate suit against the U.S. Government under the Federal Tort Claims Act, 28 U.S.C. § 2675. See, *McKissic v. The United States of America*, Case No. 1:13 CV 1522 (filed July 15, 2013). The two cases have been consolidated. Neither the City of Strongsville, nor the United States Government have joined in Officer Miller's Motion to Dismiss or in the Alternative, Motion for Summary Judgment.

Because Officer Miller attached factual evidence to his Motion, the Court treated the motion as one for summary judgment, pursuant to Fed. R. Civ. P. 11(d), and allowed limited discovery to address the qualified immunity issue before requiring a response from Plaintiff. The briefing on the qualified immunity issue is now complete and the Court will consider the evidence properly presented by both parties in its deliberation.

## FACTS[1]

On December 3, 2011, Mr. McKissic drove a known drug dealer, Lorenzo Dobyne, to the Strongsville WalMart, where Mr. Dobyne sold crack cocaine to a confidential informant. The

---

[1] Except as otherwise noted, the factual summary is based solely upon the undisputed facts set forth in the parties' statements of facts, the Plaintiff's Complaint, and the deposition transcripts filed with the Court as part of the summary judgment motion briefing. Those facts which are contested and have some support through the presented evidence will be noted as being in dispute, but, for the purpose of this opinion shall be construed in the light most favorable to the Plaintiff as required under the Summary Judgment standards.

transaction between Mr. Dobyne and the informant had been set up by the NOLE Task Force. The plan was to allow the sale to occur in the WalMart parking lot, wait for the car to leave the parking lot, and then to have marked police cruisers from the City of Strongsville perform a traffic stop to arrest the suspect(s). Officer Miller was to pick up the confidential informant after the sale and collect the evidence.

Lt. Michael Connelly, the NOLE Task Force supervisor was overseeing the bust. After the controlled purchase was complete and the informant had left the vehicle, Lt. Connelly noticed that Mr. Dobyne and Mr. McKissic did not appear to be paying attention to their surroundings. He made the decision at that point to change the plan and execute the arrest in the parking lot. When Lt. Connelly gave the "take down" signal, Officer Miller and Lt. Connelly were the two closest police vehicles, therefore, it was their role to box in the suspect's vehicle.

Lt. Connelly pulled his vehicle behind Mr. McKissic's car effectively blocking any rear exit. Lt. Connelly exited his vehicle and removed Mr. Dobyne from the passenger side of Mr. McKissic's car. He took Mr. Dobyne to the ground and eventually handcuffed him. Officer Miller attempted to block in Mr. McKissic's car from the front, but overshot his position leaving an opening through which Mr. McKissic could escape. Officer Miller exited his vehicle, approached the front of Mr. McKissic's car, drew his firearm, identified himself as a police officer,[2] and ordered Mr. McKissic to put the vehicle in park. Mr. McKissic did not put the vehicle in park. Officer Miller eventually shot Mr. McKissic several times. The parties disagree as to what exactly occurred between the time Officer Miller exited his car and when he fired at Mr. McKissic.

According to Mr. McKissic, his car was moving "a little bit" forward to make a right turn after Officer Miller's truck had stopped in front of, but angled to the left side of his car. (McKissic Depo. at 111, 175, ECF #69, 111, 175). He claims that as he began to move forward,

---

[2]Mr. McKissic testified that he did not remember Officer Miller verbally identifying himself as "police," but that he, nonetheless, knew or assumed that he was a police officer.

-3-

the Officer was not yet in front of the car. (McKissic Depo. at 120, ECF #69, p. 120). Mr. McKissic says he applied the brake and stopped the car when he then observed a person he believed to be a police officer standing in front of the car, pointing a weapon at him. (McKissic Depo. at 101-103, 112, 138, 176, 214-215, ECF #69, p. 101-103, 112, 138, 176, 214-215). He testified that the officer told him to "freeze" or "put your hands up." (McKissic Depo. at 101, 103, 106, 138, ECF #69, p. 101, 103, 106; ECF #62-4, p. 31). Mr. McKissic admitted telling the investigators that Officer Miller told him to put the car in park more than once. (McKissic Depo. at 107, 139, 178, ECF #69, p. 107, 139, 178; Miller Depo. at 92, #64-3 p. 20). The gear shift was on the floor. (McKissic Depo. At 92, ECF #69, p. 92). Mr. McKissic never put the car in park because he claims he did not have a chance to do so. (McKissic Depo. at 106-108, 180, ECF #69, pp. 106-108, 180). He testified that he tried to but did not get it in park before moving his hand upward in a surrender position. (McKissic Depo. at 203, ECF #69, p. 203). However, Mr. McKissic claims that his foot remained on the brake, and the car never moved again, nor did it ever move towards the officer until after he had been shot. (McKissic Depo. at 110-112, 120-122, 189, 214-215, ECF #69, pp. 110-112, 120-122, 189, 214-215). He never put his foot on the accelerator. (McKissic Depo. at 112, 121-122, ECF # 69, p. 112, 121-122).

Mr. McKissic recalls that when Officer Miller appeared in front of his car, his left hand was on the steering wheel, and his right hand may have been in his lap or near the arm rest/storage console. (McKissic Depo. at 104-105, 109, 178, ECF #69, p. 104-105, 109,178; Miller Depo. at 92, ECF #68, p. 92). When the shots were fired, his left hand was on the steering wheel, and his right hand was raising up from the console area. (McKissic Depo. at 109, ECF #64-2, p. 28). Mr. McKissic contends that he did not put his hand in his jacket at any point in time, nor does he have any recollection of telling investigating officers that he had done do. (McKissic Depo. at 108-110, ECF# 64-2, pp. 26-29; ECF #64-2 at 78). He does recall telling the FBI that he did not believe he reached into his jacket. (McKissic Depo. at 140, ECF 369, p. 140).

-4-

Mr. McKissic recounts that following the first shot, Officer Miller started walking sideways toward the passenger side.  (McKissic Depo. at 116, ECF #69, p. 116).  The front windshield shows at least nine holes, some of which could appear to show two holes overlapping.  (ECF #68, p. 164).  The passenger window appears to be completely broken out, and the driver's window shows a large jagged hole.  (ECF #64-3, p. 31).  He claims that when he was shot he raised his right hand or arm in front of his face to protect himself.  (McKissic Depo. at 117-119, 124, ECF #69, p. 117-119, 124).   He also testified that once hit, he slumped to the left and his foot came off the brake causing the car to roll forward.  The car rolled until it crashed into other parked cars.  (McKissic Depo. at 122-124, ECF #69, p. 122-124).  He does not recall or believe that the Officer was still in front of the vehicle when it began to roll, or that the Officer was ever hit by the vehicle.  (McKissic Depo. at 121-122, ECF #69, p. 121-122).  He also does not recall any shots being fired after the car crashed.  (McKissic Depo. at 123, ECF #69, p. 123).  Finally, he remembers hearing "the cops say they fucked up," when he was pulled from the car after it had crashed.  (McKissic Depo. at 125-126, 209, ECF #69, p. 125-126, 209).

The video evidence could be viewed as consistent with Mr. McKissic's testimony.  There is a slight and slow  movement toward a right turn shortly after Officer Miller's truck arrives on the scene.  (Video 53-55 seconds).  The video evidence does not clearly depict where Officer Miller was when this occurred.  Consistent with Mr. McKissic's testimony, however, the car clearly stops and does not appear to move again until it begins a continuous roll ending in the final crash.  (Video at 58/59 - 107 seconds).  The video would indicate that Lt. Connelly began pulling Mr. Dobyne out of the car at just about the same time as the car began to roll.  (Video at 58-59 seconds).  Lt. Connelly testified that he heard shots fired as Mr. Dobyne "was coming out of the car," and felt the car move about that same time.  (Connelly Depo. at 44-45, ECF #70, p. 45).[3]  This could be found to be consistent with Mr. McKissic's testimony that shots were fired

---

[3]Lt. Connelly's testimony on the timing of the shots is not consistent throughout his deposition, or even necessarily within the answer to each individual question.  In fact, in follow up questions he testified that the shots did not come until after he extracted Mr. Dobyne from the

-5-

before the car began to move toward Officer Miller.

In addition, everyone on the scene appears to agree that Mr. McKissic's vehicle when moving, was moving slowly.  Some officer testimony, though at times conflicting, supports Mr. McKissic's contention that he never accelerated the car or revved the engine, and that any movement was consistent with the car rolling in idle.  (Miller Depo. at 114, ECF #68, p. 114; Negron Depo. at 36-37, ECF #71, p. 36-37; Dzurisin Depo. at 44, ECF #72, p. 44).   Further, based on the deposition testimony of all of the officers on scene, none of them, including Officer Miller took action to remain under or to seek cover during the unfolding of the events.  In fact, all testimony indicates that Officer Miller actually moved from a place of safety into the direct path of a vehicle he knew was not in park (or depending on whose testimony is considered was, in fact, actually moving).  In addition, the deposition testimony indicates that over the fourteen seconds during which events unfolded, the officers did not communicate with each other in any way to organize Mr. McKissic's safe arrest, or to communicate an escalating danger to the officers or the public.

There is additional evidence that could also be construed as corroborating Mr. McKissic's account of the events including evidence that Mr. McKissic had bullet wounds on the inside part of his forearm that could be inconsistent with the positioning of his arm as described by Officer Miller.  (McKissic Depo. at 150, ECF #69, p. 150).  There were also bullet wounds on the inside of his arm that could be consistent with his testimony indicating that he raised his arm in front of his face to protect himself during the shooting, and possible inconsistent with Officer Miller's description of him reaching into his jacket. (McKissic Depo. at 148, ECF #69, p. 148).

---

car and it had moved several feet past him. Although these inconsistencies may simply be attributable to a misunderstanding of the question, stream of consciousness answering, or the difficulty of re-creating past events that occurred simultaneously or in quick succession, for purposes of this opinion we must consider the testimony in the light most favorable to Mr. McKissic.

Officer Miller has a different account of the events leading up to the shooting. He testified, in conflict to Mr. McKissic's claims, that the car slowly moved toward him while he was standing in front of it, and that it came in contact with his knees, causing him to step backwards. He testified that prior to contact, Mr. McKissic "slowly started to move towards his jacket". . . that Mr. McKissic "reached his second set of knuckles into his jacket," making him afraid that Mr. McKissic had a weapon . . . and that after this "the vehicle began to come forward again." (Miller Depo. at 93-94, ECF #68, p. 93-94). This is when Officer Miller claims that he fired the first shot. He alleges that after firing the first shot, the car contacted his knees again, McKissic's hand remained in the jacket, and the car continued to advance towards him. (Miller Depo. at 94, ECF #68, p. 94). He further contends that the whole time he was shooting Mr. McKissic had his right hand inside his jacket up to the second knuckle (i.e. half of his fingers and none of his palm), and he never raised his right hand or arm up to block his head. (Miller Depo. at 108-109, 121, 132, ECF #68, p. 108-109, 121, 132). He admits that he never saw a weapon, a bulge in Mr. McKissic's jacket, any object looking like a gun handle, or anything metallic in Mr. McKissic's possession. (Miller Depo. at 129, ECF #68, p. 129). Officer Negron and Officer Dzurisin, also both testified that they could see the driver and his hand movements clearly, and they corroborate Officer Miller's testimony that Mr. McKissic placed his hand inside his jacket before he was shot. They also admit that they saw no sign of an actual weapon, and that Mr. McKissic's hand never passed the tops of his fingers ("to the thumb") when allegedly placed inside his jacket. In addition, they both testified that the car was moving toward Officer Miller before shots were fired.

Officer Miller also testified that while on scene, he told the other officers, Officer Negron, Officer Dzurisin, and Lt. Connelly, that Mr. McKissic was reaching into his jacket and driving the car into him on scene, prior to any reports being prepared by the officers. (Miller Depo. at 140-141, ECF #68, p. 140-141). Lt. Connelly's testimony corroborates this. (Connelly Depo. at 58-60, ECF #70, pp. 58-60). If, in fact, the other officers did discuss Officer Miller's

-7-

perception of the events before recording their statements may be relevant to the credibility of the other officer's corroborating testimony.

Officer Negron claims that Officer Miller did not explain any facts leading up to the shooting on scene or anytime the day of the shooting or anytime thereafter, and that the officers were separated or kept apart so they would not talk about the case. (Negron Depo. at 49-51, 59, 62, 64-65, ECF #71, p. 49-51, 59, 62, 64-65). This directly contradicts the testimony from Lt. Connelly who made perfectly clear that no one was separated or prevented from talking after the events. (Connelly Depo. at 58-60, ECF #70, pp. 58-60). This discrepancy creates an additional issue of credibility for a jury to determine when examining Officer Negron's testimony, which supports Officer Miller's version of the events. The value of Officer Negron's testimony is also dependent on the credibility a jury would assess to his alleged observations, considering on his relative positioning during the events. (Negron Depo. at 40-58, 69-70, ECF #71, pp. 40-58, 69-70).

There is some testimony from Officers Negron and Dzurisin that could be viewed as contradictory to the video footage as to when the car was moving, and where the officers were at various points during the event. There are also conflicting statements within and/or between the officers' testimony with regard to the timing of the shots, the timing of the vehicle's movements, the placement of the officers' vehicles at the scene, and other events that preceded the shots. These inconsistencies as well as admissions as to missing or unclear memories of the events due to passage of time, create questions of fact, and could be considered relevant to establishing the credibility assigned to the relevant testimony.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue"

rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

Celotex v. Catrett, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" only if its resolution will affect the outcome of the lawsuit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  When reviewing a summary judgment motion, the Court must view the facts in the light most favorable to the non-moving party, in this case, the Plaintiff.  Plumhoff v. Rickard, Sup. Ct. Case No. 12-1117, decided May 27, 2014, 2014 WL 2178335 (U.S.).  Summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

**DISCUSSION**

The United State Supreme Court has determined that "all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." Graham v. Connor, 490 U.S. 386, 395 (1989).  The Fourth Amendment to the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

The Fourth Amendment is applicable to the states and their subdivisions by the Fourteenth

Amendment.

The Supreme Court has consistently held that a police officer's shooting of a fleeing suspect constitutes a "seizure" of the person under the Fourth Amendment. Tennessee v. Garner, 471 U.S. 1 (1985); Brower v. County of Inyo, 489 U.S. 593 (1989).  Therefore, we start from an acknowledgment that Mr. McKissic was "seized" when he was shot by Officer Miller.  Seizure, alone, however, does not necessarily violate the Fourth Amendment. In order to generate liability under this provision, a seizure must be unreasonable.

In determining whether Officer Miller acted reasonably, we must view the facts and circumstances in the light most favorable to the Plaintiff, under the summary judgment standard. Once the summary judgment standard is employed to establish which facts are presumed to be true, the presumed scenario must be  considered from the perspective of a reasonable officer on the scene, and not with detachment of a disinterested party privileged with 20/20 hindsight. See, Graham v. Connor, 490 U.S. 386, 396-397 (1989).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id.   The Sixth Circuit has elaborated on this standard noting that "[w]e must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.  What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." Smith v. Freland, 954 F. 2d at 347.

Taking in all the evidence, and construing the facts in the light most favorable to Mr. McKissic, we must presume that Mr. McKissic was a participant in the sale of drugs to a confidential informant.  The officers in this case had no prior experience with or knowledge of Mr. McKissic. Mr. McKissic was in a car that was running and was beginning a slow right turn when Officer Miller stepped toward his vehicle with his gun drawn.  Upon seeing the officer, Mr. McKissic immediately stopped his vehicle.  Officer Miller placed himself in front of the car,

knowing that it was not in park. Officer Miller began issuing conflicting orders telling Mr. McKissic simultaneously to "freeze," "put your hands up," and "put the car in park." Mr. McKissic did not put the car in park but had his left hand visible on the steering wheel and was raising his right hand up from the console or shifting area toward his body or face, possibly in a "surrender" position. Without seeing a gun, any bulge in clothing suggesting a gun, or anything metallic that could have been construed as a weapon, Officer Miller then fired at Mr. McKissic, causing him to slump toward the driver's door and move his foot off the brake. This may have caused the car to roll slowly forward. Mr. McKissic never accelerated. Officer Miller continued shooting until his weapon was empty and Mr. McKissic's car had rolled into other parked cars, bringing it to a stop. Mr. McKissic survived but suffered multiple gunshot wounds to his right arm and face. Mr. McKissic was unarmed. Another officer on the scene was able to remove the passenger from the car and arrest him without incident or injury. At no point in time were any other officers in the path of Mr. McKissic's vehicle, nor did any attempt to take cover from any perceived danger. No other officer discharged a weapon. No officer was hurt during the incident. Other officers on the scene expected that Officer Miller would have immediately approached the driver by the driver's door and attempted to remove him from the vehicle rather than placing himself in front of a running vehicle, with a suspect behind the wheel.

Though, Mr. McKissic, was unarmed, he was not necessarily innocuous. A car can be a deadly weapon. See, e.g., United States v. Sanchez, 914 F.2d 1355 (9th Cir. 1990), cert. denied, 113 L. Ed. 2d 723, 111 S. Ct. 1626 (1991). Nonetheless, the fact that a suspect is sitting in a car with the engine running is not, in and of itself, a sufficient reason for an officer to open fire, even if the officer has voluntarily place himself in the potential path of the vehicle. Officer Miller claims that he perceived danger sufficient to justify gunfire because Mr. McKissic slowly advanced the car in his direction, and reached his hand half way into his jacket, while refusing to put the car in park. Even if we were to accept that these actions could be sufficient to justify the level of force employed, these material facts are clearly in dispute. If the Plaintiff's version of

events is true, as we must assume at this stage of the proceedings, a jury could certainly find that Officer Miller used excessive force in effectuating Mr. McKissic's arrest.

Officer Miller contends that even if there is a question of fact as to the use of excessive force, he is still entitled to dismissal on the basis of qualified immunity. When confronted with a request for qualified immunity, the Court must first determine whether a constitutional right would have been violated on the facts alleged by the Plaintiff. *Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001). This issue has been addressed above. If, as in this case, the facts as alleged by Plaintiff could constitute a constitutional violation, the Court must next determine whether the right at issue was clearly established at the relevant time. *Id.*

A defendant cannot be held responsible for violating a "clearly established right" unless the parameters of the established right are "sufficiently definite that any reasonable officer in the defendant's shoes would have understood that he was violating it" in the particular circumstances that he faced. *Plumhoff v. Rickard*, Sup. Ct. Case No. 12-1117, decided May 27, 2014, 2014 WL 2178335, *9 (U.S.). After surveying the cases cited by the parties, and conducting our own comprehensive review of the relevant case law, the Court finds that it was clearly established, at the time of Mr. McKissic's shooting, that an officer may not use potentially deadly force to effectuate an arrest in the absence of any reasonably perceived threat of death or serious physical injury to the acting officer or others. Officer Miller has not cited any U.S. Supreme Court cases, or Sixth Circuit cases in support of his claim that officers are allowed to shoot under the circumstances alleged in this case.

Further, all of the cases cited by Officer Miller are clearly distinguishable from the facts as alleged by Plaintiff, in this case. In, Ontiveros v. City of Rosenberg Tex., 564 F.3d 379, 385 (5th Cir. 2009), cited by Officer Miller, the police were executing a warrant against an individual who the police knew had threatened two people with a revolver and a rifle, and had threatened to kill those individuals. They entered the house at night, with little to no lighting and knew that the suspect was hiding behind a door. When the door was opened the suspect was holding an

item over his head and was later thought to be reaching into a boot, ignoring commands to "let me see your hands" when he was shot.  This case bears no resemblance to Mr. McKissic's alleged fact pattern.  All parties agree that the police in this case had no prior information that Mr. McKissic was dangerous or was likely to be armed.  The arrest was made outside during the day with full visibility, and Mr. McKissic was never seen with an object or item that could have been mistaken for a gun.  Taking the facts in the light most favorable to Mr. McKissic, he was also attempting to comply with the command to "freeze" or show his hands, and he never reached into his jacket before being shot.  Oakes v. Anderson, 494 F.App'x 35, 37-38 (11th Cir. 2012), is equally divergent from the facts asserted in this case.  In Oakes as in Ontiveros, the police were dealing with a suspect they knew to be dangerous.  The suspect in this case was known to be distraught, under the influence of alcohol, suicidal, and likely to be in possession of a gun.  Further, the officer in Oakes attempted several times and over several minutes to get the suspect to leave the vehicle voluntarily and remove him from the car without firing any weapons.  The officers in Oakes only fired their weapons after the suspect told them that they "better unsnap" because "he ain't going down this way," mimed pointing a gun at the officer, reached for the console, and refused to show his hands again for over thirty seconds.  *Id.* at 36-38.  No similar factors were in play in this case under any alleged version of the facts.

     Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001), is also distinguishable.  As in the first two cited cases, the officer in Anderson approached the subject with prior knowledge that a weapon was likely present.  An observer notified police that they saw Anderson walking through a mall and he appeared to be armed.  The officer also noted a bulge near Anderson's waistband that was consistent with the shape of a gun.  Further, although Anderson originally complied with the officer's request to raise his hands over his head, he later lowered his hands towards the gun-shaped bulge without explanation.  In this case Officer Miller testified that he did not see any indication of a weapon, and he had no prior information about Mr. McKissic that would have indicated he might be armed.  Further, Mr. McKissic claims he was raising his hands up to

-13-

comply with Officer Miller's directions when he was shot, not reaching down toward a possible weapon.

In Young v. City of Killeen, Tex., 775 F.2d 1349, 1352-53 (5th Cir. 1985), the facts are closer but still distinguishable. In *Young* the court found that because the suspect in that case "apparently made a movement as if to duck back into the car to retrieve something," reaching for the seat or floorboard, the officer was justified in shooting. *Id*. at 1352. As stated above, however, if the evidence in this case is viewed in the light most favorable to Mr. McKissic, it cannot be said that he made any unusual movement that would have clearly led a reasonable officer to believe he had a weapon and posed an imminent danger to the officers or others. Further, Young was decided prior the decision in Graham v. Connor, 490 U.S. 38 (1989), which changed the reasonableness standard from a subjective standard, to that of an objective police officer.

Officer Miller has cited no cases in which a Court has sanctioned the use of gunfire against an unarmed person, with no known proclivity for violence or for carrying a weapon, sitting in a stopped vehicle (albeit running), who has not previously attempted escape, or previously endangered or injured an officer during the same course of events.  Further, he has cited no cases where a suspect was shot simply for raising his arm across his body or failing to immediately follow an officer's command.

This Court has also failed to find any cases that would support qualified immunity under these alleged facts during its independent review. Although some cases have found no excessive force when the perceived danger arose from the suspect's position in a vehicle with the engine running, there was always an additional event that heightened the officer's belief that the driver would use the vehicle as a weapon. In almost every case sanctioning the officer's use of deadly or potentially deadly force, prior to an officer's use of gunfire the driver had either already hit an officer or a police vehicle, had engaged in aggressive driving that directly threatened an officer or the public, had fired shots or otherwise used force against an officer or civilian, was known to

be in possession of a weapon, had previously fled during the same incident, had failed to respond to an officer's use of lesser force, and/or had engaged in a dangerous high speed chase prior to the execution of the stop.  See, e.g., Plumhoff v. Rickard, Sup. Ct. Case No. 12-1117, decided May 27, 2014, 2014 WL 2178335 (U.S.)(high speed chase in excess of 100 mph, forcing other drivers to alter course, and second attempt to flee after collision with police car); Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed.2d 686 (2007)("shockingly fast" night chase that forced other motorists off the road, while running red lights, and driving in the wrong lane); Brosseau v. Haugen, 543 U.S. 194, 125 S. Ct. 596, 160 L. Ed.2d 583 (2004)(suspect was fleeing and being pursued on foot before entering the vehicle, and the officer attempted unsuccessfully to extract the driver through less forceful means prior to shooting); Hocker v. Pikeville City Police Dept., 738 F.3d 150 (6th Cir. 2013)(intoxicated, possibly suicidal driver in high speed, nighttime, lights off chase, who, when cornered, accelerated in reverse rammed a police cruiser hard enough to move it thirty feet).

      The Court, however, has found a multitude of cases in which the Sixth Circuit, and others have found a triable question of fact as to excessive force, and have denied qualified immunity on fact patterns far more similar to and often more ominous than those alleged in this case.  See, e.g., Estate of Kirby v. Duva, 530 F.3d 475, 479-80 (6th Cir. 2008)( no qualified immunity when police shot a suspect known to be violent, paranoid, and armed, who by Plaintiff's account was driving slowly around the officers on scene who had blocked his car in, and whose car was stopped before the shooting began)(relying on Tennessee v. Garner, 471 U.S. 1, 9-11, 105 S. Ct. 1694, 85 L. Ed. 2d 1  (1985)); Sample v. Bailey, 409 f.3d 689, 697-98 (6th Cir. 2005) (no qualified immunity when suspect shot because he did not show hands as ordered because he needed to hang onto cabinet to stand as he was also ordered to do); Floyd v. City of Detroit, 518 F.3d 398 (6th Cir. 2008)(no qualified immunity when officers unreasonably and incorrectly believed suspect to have a gun); Sulfridge v. Huff, 509 F.Supp. 2d 709 (E.D. Tenn. 2007)(shots fired as suspect is trying to stop may be excessive and not entitled to qualified immunity); Dugan

v. Starrett, 2:12-CV-0081, 2014 WL 773226 (S.D. Ohio Feb. 25, 2014)(even if car is able to move, force may be excessive if officer could have safely moved out of the way); Bouggess v. Mattingly, 482 F.3d 886, 891 (6th Cir. 2007)(it is unreasonable to use deadly force against a drug dealer based on a generalized perception that drug dealers are dangerous, absent a particularized and supported basis for feeling in danger in the instant confrontation); Smith v. Cupp, 430 F.3d 766, 775 (6th Cir. 2005)(no qualified immunity where despite being in possession of a dangerous weapon by way of his moving vehicle, the suspect was not threatening the lives of those around him when he was shot); Estate of Starks v. Enyart, 5 F.3d 230 (7th Cir. 1993)(no qualified immunity when officer shoots driver of a fleeing car if the car did not pose a serious, non-avoidable threat to the officer).

Therefore, when the facts as alleged by the Plaintiff and supported by some evidentiary materials, are taken to be true, there remains a question of fact as to whether Officer Miller's actions constituted excessive force in violation of the Fourth Amendment of the U.S. Constitution. Further, the parameters of this established right would be "sufficiently definite that any reasonable officer in the defendant's shoes would have understood that he was violating it" by shooting under the facts as alleged by Plaintiff, if found to be true.

## CONCLUSION

For the reasons set forth above, Defendant, Officer Miller's Motion to Dismiss, or Alternatively for Summary Judgment (ECF #64) is DENIED. IT IS SO ORDERED.


    /s/ Donald C. Nugent
Donald C. Nugent
UNITED STATES DISTRICT JUDGE

Date: August 1, 2014